## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br><br><br><br>Vitalii Chychasov, )<br><br>Defendant. ) | Docket No.: 8:22-cr-72-KKM-CPT<br><br>**SENTENCING MEMORANDUM** |

Defendant Vitalii Chychasov, by and through counsel, respectfully submits this memorandum in support of a non-Guideline sentence of time served.

### I.    HISTORY AND CHARACTERISTICS OF DEFENDANT

Vitalii Chychasov, age 37, was born on January 4, 1986, in Slovyansk, Ukraine. His father is Yuri Chychasov, age 67, and his mother is Valentina Chychasov, age 67. Mr. Chychasov has a very close relationship with his parents. His parents are retired and suffer from diabetes (father) and gall bladder-related problem (mother). They live in Ukraine, where they are exposed to bombings, killings, and devastation caused by the violence and looting as a result of the Russian-Ukrainian war's atrocities. Together with their age and serious health conditions, the fact that the parents are in the middle of the prolonged war that has lasted for almost two years, without adequate medical treatment and special nutrition they require, Mr. Chychasov's presence is critical to their survival. Moreover, it should be noted that the parents and his family live close to the war zone, and they cannot leave Ukraine without Mr. Chychasov assistance. This factor alone warrants the requested grant of  non-Guideline sentence of time served.

Mr. Chychasov graduated with a degree in Economics from university in Ukraine in 2008.

Mr. Chychasov's first marriage failed as the couple divorced after just two years of marriage in February 2010. Mr. Chychasov married his current wife, Diana Chychasov, at the age of 34, in 2016. Their love story is amazing. Mr. Chychasov previously knew Diana as they were "college sweethearts;" however, they separated in 2009 and married to other people. When Mr. Chychasov saw Diana again in 2012, he knew that he could not remain married to Eugenia because Diana was his true love. After that moment, they were never separated until his arrest. Mr. Chychasov and Diana have one child together, Daryna Chychasov, age five. Prior to his arrest, Mr. Chychasov resided with his wife and daughter in Ukraine. While Diana and Daryna currently reside with Diana's mother and sister in Ukraine because Diana requires nearly full-time care and help with their daughter, she truly desperately need his husband's support and love, without which her life does not make any sense. Moreover, the presence of Diana's mother and sister is a temporary short term arrangement as they need to take of their own families. Daryna is a generally healthy child, but that she recently experienced trouble with her heart and has a medical appointment pending with a cardiologist.

Unfortunately, Diana is now disabled as a result of being diagnosed with Syringomyelia in 2012. Syringomyelia is a formation of fluid-filled cysts within the spinal cord that causes progressive pain, weakness, and stiffness in the arms, legs, back, and shoulders. From 2012 to 2015, she underwent three complicated surgeries on her vertebrae. Exhibit 7. As a result of the disease, Diana is not permitted to lift anything heavier than approximately 6.6 pounds, and she experiences weakness in both of her arms and short-term memory loss. Diana receives a disability due to her medical conditions. See Exhibit 5. As such, Diana Chychasova's functional status and state of health, as well as her daughter's well-being, are fully dependent on Vitalii

Chychasov's help and support. Due to Diana's disability, from the day Daryna Chychasova was born, Mr. Chychasov was the primary caregiver to both his wife and his daughter.

Diana had a recent evaluation by the neurologist in March 2023 and had her MRI done at The Institute of Charitable Foundation in Lviv on 3/9/2023, which showed a possible recurrence of the tumor at the level of T5. While she was advised to have further imaging, she is unable to afford it; thus, Mr. Chaychasov's return to Ukraine is critical to her health. Moreover, since there is no daycare access due to the war in Ukraine, their five-year-old daughter is fully dependent on Mr. Chychasov's support and assistance.

Diana writes to the Court,

> There is a war in Ukraine and this is another test for our family, and it is very difficult for us without my husband - our protector, because I have a disability (please find a certificate attached to this letter). At the present time, after all the stresses that fell on our family - this is the war and the arrest of my husband - my only helper, my condition worsened and the former symptoms, such as headache, dizziness, weakness and numbness in the body returned. To make things worse, we had to leave our place of residence, our house, because fighting is going on in Donetsk Region and it is not safe to live there. Consequently, my daughter and I have a bull's eye on our back without the support of my husband. Vitalii is the only one person with whom we feel safe. He is our protection and support. Please put yourself in our place, have pity on his family, we miss him so much.

Exhibit 2.

Mr. Chychasov was arrested in Hungary pursuant to an Interpol on March 12, 2022, where he was detained until his extradition to the United States.[1]   He consented to his extradition and was detained by federal authorities in Orlando, Florida, on July 22, 2022. Mr. Chychasov was held in federal custody since that time.

---

[1] Mr. Chychasov respectfully requests that the Court credit his four-month detention in Hungary while

## II.      OFFENSE CONDUCT

On July 21, 2023, Mr. Chychasov pled guilty to Counts One and Two of the Indictment pursuant to a written plea agreement. Count One of the Indictment charges Mr. Chychasov with Conspiracy to Commit Access Device Fraud, in violation of 18 U.S.C. § 1029(a)(2), (3), and Count Two of the Indictment charges him with Trafficking in Unauthorized Access Devices, in violation of 18 U.S.C. §§ 1029(a)(2), 1029(c)(1)(A)(i) and 2.

## III.      GUIDELINES CALCULATION

The Supreme Court has made it clear that a district court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range," which is the "starting point and the initial benchmark." Gall v. United States, 552 U.S. 38, 49 457 (2007).

In Defendant's Presentence Report, the Probation determined his total offense level of 39, a criminal history category of I, and the guideline imprisonment range of 262 months to 327 months. However, in light of the fact that the statutorily authorized maximum sentences are less than the minimum of the applicable guideline range, the Probation recommends the guideline term of imprisonment of 180 months under U.S.S.G. §5G1.2(b).

This unreasonably high calculation is primarily due to the improper application of 2B1.1 Application Note 3(F)(i) because the actual loss is much lower than the proposed $1,162,896,500.

As such, Mr. Chychasov respectfully objected to Probation's proposed estimated loss amount of $1,162,896,500, resulting in the increase of the offense level by 30 levels.

Mr. Chychasov's position is that  U.S. Sentencing Guidelines Manual § 2B1.1 Application Note 3(F)(i) is inconsistent with the plain meaning of "loss" and operated as an enhanced punishment, rather than an assessment of loss tied to the facts of the case. Specifically, paragraph 25 of the PSR states that "Chychasov admitted that he personally obtained $5,000,000 for his participation in the trafficking and possession of these access devices," and "[f]rom

November 2015 through May 2022, across all domains, the servers reflected $19,303,008 earned for the sale of access devices."

Therefore, either the amount of his personal gains of $5,000,000 or the total $19,303,008 earned for the sale of access devices should be the loss attributable to Mr. Chychasov for sentencing purposes (18 or 20 levels enhancement under 2B1.1 (b) (1) (J), (K)), and not the draconian $1,162,896,500. It should be noted that the Plea Agreement's estimated amount of loss provided for 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K), i.e., "more than $9,500,000 but less than $25,000,000." Plea Agreement at ¶10.

Thus, the Court should not use § 2B1.1 Application Note 3(F)(i) ($500 per account enhancement)  in this case because the actual loss was **at most** $19,303,008. In fact, the Supreme Court held that there is a limit to the binding nature of the Guidelines Manual Application Notes. In Stinson v. United States, 508 U.S. 36, 38 (1993), the Supreme Court held that "commentary in the Guidelines Manual that interprets or explains a guideline is authoritative unless it violates the Constitution or a federal statute, or is inconsistent with, or a plainly erroneous reading of that guideline." (emphasis added). As one Court states, Sentencing Commission's "Application Notes are not formally part of the Guidelines, but serve to 'interpret[]' and 'explain[]' the Guidelines for district courts." United States v. Prien-Pinto, 917 F.3d 1155, 1157 (9th Cir. 2019).

As such, there is an important distinction between the Guidelines and Application Notes. That is because Congress, too, has a role over the Guidelines. Stinson, 508 U.S at 44. Congress charged the Commission with promulgating the Guidelines and retains the right to review the Guidelines. Id. at 44-45. So any amendment to the Guidelines must be submitted to Congress for a six-month period of review, during which time Congress can "modify or disapprove them." Id. at 41. By contrast, "Congress lacks the power to modify or disapprove of Application Notes," which the Commission has unbridled discretion to issue. Prien-Pinto, 917

F.3d at 1157.   See also Kisor v. Wilkie, 139 S Ct 2400, 2414-15 (2019)("deference is not the

answer to every question of interpreting an agency's rules," the exercise of judicial "reviewing

and restraining functions" is necessary for determining whether deference is warranted).

 Applying this rationale, courts have found Application Notes non-binding for

conflicting with the Guidelines. See, e.g., United States v. Rising Sun, 522 F.3d 989, 996 (9th

Cir. 2008) (holding that an Application Note cannot expand an enhancement for obstruction of

justice "during" an investigation to include conduct taking place before an investigation); United

States v. Lambert, 498 F.3d 963, 971 (9th Cir. 2007)(the Guidelines commentary need not be

followed when it establishes a "narrowing" construction not "found in the Guideline text");

United States v. Powell, 6 F.3d 611, 614 (9th Cir. 1993)(determined that an Application Note

cannot render a part of the Guidelines "meaningless").

 Several federal Courts have already reexamined guideline commentary

Application Note 3(F)(i) under Stinson and Kisor standards. In United States v. Kirilyuk, 29

F.4th 1128, 1137-1139 (9th Cir. 2022), the Court discussed Application Note 3(F)(i) in details as

follows:

 we turn to Application Note 3(F)(i)'s $500-per-card multiplier.
 Section 2B1.1 generally applies to crimes involving theft, stolen
 property, fraud, and counterfeiting. U.S.S.G. § 2B1.1. The offense
 level of § 2B1.1 is determined in large part by the crime's "loss"
 amount. As we've explained, the Guideline "provide[s] for
 graduated increases to the base offense level depending on the
 amount of loss caused by the crime." Gainza, 982 F.3d at 764.
 Subsection (b)(1) of § 2B1.1 establishes a table that increases the
 base offense by commensurate levels of loss "[i]f the loss
 exceed[s] $6,500[.]" U.S.S.G. § 2B1.1(b)(1).

 Application Note 3(F) provides for "special rules" to "be used to
 assist in determining loss." Id. cmt. n.3(F). In particular, it provides
 that in a case involving stolen or counterfeit credit cards, "loss
 includes any unauthorized charges made with the [credit cards] and
 shall be not less than $500 per [credit card]." Id. cmt. n.3(F)(i). In
 other words, Note 3(F)(i) creates a rigid, fictional $500 minimum
 loss amount per credit card—no matter the facts of the particular
 case.

**The question here is simple: Is Note 3(F)(i)'s "special rule" for calculating loss by using a minimum $500-per-card multiplier consistent with the plain meaning of "loss"? We hold that it is not**.

To begin, § 2B1.1 does not define "loss." In interpreting the Guidelines, we apply the ordinary tools of statutory interpretation and look to the plain meaning of its terms. United States v. Turnipseed, 159 F.3d 383, 387 (9th Cir. 1998). Such tools include "consult[ing] dictionary definitions, which we trust to capture the common contemporary understandings of the word." United States v. Flores, 729 F.3d 910, 914 (9th Cir. 2013).

As the Sixth Circuit recently showed, a review of dictionaries reveals that "loss" can have a range of meanings:

One dictionary defines the word to mean, among other things, the "amount of something lost" or the "harm or suffering caused by losing or being lost." American Heritage Dictionary of the English Language 1063 (3d ed. 1992). Another says it can mean "the damage, trouble, disadvantage, [or] deprivation . . . caused by losing something" or "the person, thing, or amount lost." Webster's New World College Dictionary 799 (3d ed. 1996). A third defines it as "the being deprived of, or the failure to keep (a possession, appurtenance, right, quality, faculty, or the like)," the "[d]imunition of one's possessions or advantages," or the "detriment or disadvantage involved in being deprived of something[.]" Oxford English Dictionary 37 (2d ed. 1989).United States v. Riccardi, 989 F.3d 476, 486 (6th Cir. 2021).

Though dictionary definitions for "loss" may vary, they make one thing clear: "No reasonable person would define the 'loss' from a stolen [credit] card as an automatic $500" rather than a fact-specific amount. Id. Instead, § 2B1.1 is driven by "the amount of loss caused by the crime." Gainza, 982 F.3d at 764 (emphasis added). So "loss" cannot mean a pre-determined, contrived amount with no connection to the crime committed, even if it is based on the Commission's "research and data." See U.S.S.G. amend. 596 (Nov. 2000). Application Note (3)(F)(i) thus doesn't illuminate the meaning of "loss," but modifies it. Yet "Stinson requires that commentary interpret the guidelines, not contradict or add to them." Riccardi, 989 F.3d at 493 (Nalbandian, J., concurring).

**This case illustrates the egregious problem with the Application Note's expansion of the meaning of "loss."** As determined by the Probation Office, **Kirilyuk's conspiracy involved $1.4 million in actual losses or $3.4 million in intended losses. Applying the $500-per-card multiplier balloons the "loss" to $60 million—17 times greater than the intended loss.**

**per credit card, the Application Note asks us to deem each loss to be $500. Application Note 3(F)(i) thus operates as an enhanced punishment, rather than an assessment of "loss" tied to the facts of the case. But Stinson makes clear that the role of the Application Notes is to explain the Guidelines, not enact policy changes to them. We thus hold that Application Note 3(F)(i)'s expansion of the meaning of "loss" is "clearly inconsistent with the language of the Guideline" and is not binding under Stinson.** Rising Sun, 522 F.3d at 996.7

With this holding, we align ourselves with the Sixth Circuit—the only other court to consider this issue. In Riccardi,  989 F.3d 476, the majority of the court held that Application Note 3(F)(i) was not binding, though by applying the narrower deference set out in Kisor v. Wilkie, 139 S. Ct. 2400, 204 L. Ed. 2d 841 (2019). We do not express a view on that analysis. Instead, our reasoning tracks with Judge Nalbandian's Riccardi concurrence, which relied on Stinson to conclude that "[a]scribing a certain number to 'loss' is not a definition." Id. at 493 (Nalbandian, J., concurring). We thus follow our general path of "not creat[ing] a direct conflict with other circuits" in resolving this issue. United States v. Cuevas-Lopez, 934 F.3d 1056, 1067 (9th Cir. 2019) (simplified).

**Because Application Note 3(F)(i) contorts the meaning of "loss" to equal "$500" in credit card cases, we hold that it is not binding and that Kirilyuk's 22-level enhancement cannot stand**.

(Emphasis added). See also United States v. Riccardi, 989 F.3d 476 (6th Cir. 2021)(declined to defer to the automatic $500 loss amount for per access device rule in U.S.S.G. § 2B1.1's commentary because "even if there is some ambiguity in § 2B1.1's use of the word' loss,'" "this bright-line rule cannot be considered a reasonable interpretation of—as opposed to an improper expansion beyond—§ 2B1.1's text."); United States v Banks, 55 F.4th 246, 258 (3d Cir. 2022)(" Because the commentary expands the definition of "loss" by explaining that generally "loss is the greater of actual loss or intended loss," we accord the commentary no weight. Banks is thus entitled to be resentenced without the 12-point intended-loss enhancement in § 2B1.1.").

Just recently, in another cybercrime case, the court in United States v. Pakhtusov, No. 19-00310-1, (Dist. of Columbia, September 13, 2023), declined to apply Application Note

Exhibit 1 at 15-16. In that case, the Defendant's action involved unauthorized access to 17,997,500 "devices," which would have added 30 offense levels pursuant to Application Note 3(F)(i) enhancement. However, under the Plea Agreement Defendant's conduct led only to confirmed fraudulent transactions, or attempted transactions, totaling more than $550,000, but less than $1,500,000. The Court found that since "loss relevant to this case is the $550,000 to $1.5 million range," "**[i]t does not make sense having an actual loss value provided to the Court to read "loss" to instead refer to a fictional fixed value per card [$500] instead**." <u>Id</u>. at 16. (emphasis added).   The Court criticized Application Note 3(F)(i), stating:

> But whatever "loss" means, it is tied to those actual facts about the case. Note 3(F)(i) has no connection to the facts of the case, at least in terms of a dollar-per-dollar amount. It says that no matter how much harm the Defendant's conduct causes, whether it be one dollar or one million dollars, the loss must be assessed at $500 per credit card.

> While I think that perhaps the Sentencing Commission can make this policy judgment in the guideline itself, I do not think it can just construe the word "loss" this way in its application notes.

> <u>Id</u>. at 15.

Therefore, on behalf of Defendant, I respectfully request that the Court follow this rationale, finding that Application Note 3(F)(i) is not binding because <u>Stinson</u> and other cases make it clear that the role of the Application Notes is to explain the Guidelines, not enact policy changes to them, and  Application Note 3(F)(i)'s expansion of the meaning of "loss" is "clearly inconsistent with the language of the Guideline."

Therefore, the Court should use, for sentencing purposes, either the amount of Mr. Chychasov's personal gains of  $5,000,000 or the total $19,303,008 earned for the sale of access devices as the loss attributable to Mr. Chychasov as finding otherwise pursuant to  $500 per account enhancement would impermissibly and unjustifiably increase the amount of loss by **more than 60 times**.

Thus, the Court should not apply § 2B1.1 Application Note 3(F)(i) in this case because the actual loss is much lower than the proposed 1,162,896,500. As such**,** pursuant to the Probation's alternative calculation, Defendant's adjusted total Guideline offense level should be level 27, Criminal History Category I, and Guideline Range of 70 to 87 months. PSR at p. 19.

## IV. MR. CHYCHASOV'S SENTENCE

In light of the Supreme Court's decision in United States v. Booker, 543 U.S. 220 (2005) and its progeny such as Rita v. United States, 551 U.S. 338 (2007), Gall v. United States, 552 U.S. 38 (2007), and Kimbrough v. United States, 552 U.S. 85 (2007), the basic framework for sentencing now settled. First, the Court must determine the now-advisory Sentencing Guidelines range. Gall v. United States, 552 U.S. at 46. Second, the Court must undertake its overarching statutory charge to impose a sentence that, considering "the nature and circumstances of the offense and the history and characteristics of the defendant," is "sufficient, but not greater than necessary":

> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>
> (B) to afford adequate deterrence to criminal conduct;
>
> (C) to protect the public from further crimes of the Defendant and
>
> (D) to provide the Defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. §§ 3553 (a), 3553 (a)(1),(2).

Third, the Court should also consider "the kinds of sentences available . . . any pertinent Sentencing Commission policy statement the need to avoid unwarranted sentence disparities among similarly situated defendants . . . and, where applicable, the need to provide

restitution to any victims of the offense." United States v. Cavera, 550 F.3d 180, 188-89 (2d Cir. 2008), cert. denied, 556 U.S. 1268 (2009)(citations omitted); 18 U.S.C § 3553(a)(6). United States v. Davila-Gonzalez, 595 F.3d 42, 46 (1st Cir. 2010)("[A] sentencing court ordinarily should begin by calculating the applicable guideline sentencing range; then determine whether or not any departures are in order; then mull the factors delineated in 18 U.S.C. § 3553(a) as well as any other relevant considerations; and, finally, determine what sentence, whether within, above, or below the guideline sentencing range, appears appropriate.")

As the Guidelines "are not the only consideration," the district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, he may not presume that the Guidelines range is reasonable. He must make an individualized assessment based on the facts presented." Gall v. United States, 552 U.S. at 49-50 (footnote and internal citations omitted)(emphasis added).

The Guidelines should not be given more or less weight than any other factor. See United States v. Carty, 520 F.3d 984, 991 (9th Cir.), cert. denied, 553 U.S. 1061 (2008). See also Nelson v. United States, 555 U.S. 350, 352 (2009)(per curiam) ("The Guidelines are not only not mandatory on sentencing courts; they are also not to be presumed reasonable.") (emphasis in original). A court "must instead conduct its own independent review of the sentencing factors, aided by the arguments of the prosecution and defense." Cavera, 550 F.3d at 189. As a result, a sentencing court is "generally free to impose sentences outside the recommended range." United States v. Sanchez, 517 F.3d 651, 660 (2d Cir. 2008)(a district court has broad latitude to "impose either a Guidelines sentence or a non-Guidelines sentence."); United States v. Daidone, 124 Fed. Appx. 677, 678 (2d Cir. 2005)(as the Guidelines are no longer mandatory, a departure is no longer necessary in order for the sentencing court to impose a sentence below the Guidelines range). The Court's overall goal should be to impose a reasonable sentence, see, e.g., United States v. Guzman, 287 Fed. Appx. 956, 957 (2d Cir. 2008), and when considering the sentencing

factors outlined in § 3553(a), "the judge is not prohibited from including in that consideration the judge's own sense of what is a fair and just sentence under all the circumstances." United States v. Jones, 460 F.3d 191, 195 (2d Cir. 2006).

To be sure, the Guidelines range as determined by the Court, although not mandatory is an important factor for the Court to consider. However, "[i]t is important, too, to realize that departures are an important part of the sentencing process because they offer the opportunity to ameliorate, at least in some respect, the rigidity of the Guidelines themselves. District judges, therefore, need not shrink from utilizing departures when the opportunity presents itself and when circumstances require such action to bring about a fair and reasonable sentence." United States v. Gaskill, 991 F.2d 82, 86 (3rd Cir. 1993). "The Guidelines are not a straightjacket for district judges." United States v. Cook, 938 F.2d 149, 152 (9th Cir. 1991). The Sentencing Guidelines "do not require a judge to leave compassion and common sense at the door to the courtroom." United States v. Milikowsky, 65 F.3d 4, 9 (2d Cir. 1995).  Finally, the United States Supreme Court has noted "[i]t has been uniform and constant the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." Koon v. United States, 518 U.S. 81, 113 (1996).

As such, the Court may impose a sentence outside the guidelines range if it "finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described." 18 U.S.C § 3553(b)(1).

### a. Acceptance of Responsibility for the Crimes and Mr. Chychasov 's Substantial Assistance

Mr. Chychasov has fully accepted responsibility for his crimes, and he shows sincere remorse. He did not resist his extradition as he voluntarily agreed to appear in this

jurisdiction. He fully admitted that what he did was wrong, and he is fully accountable for his charged conduct.

Shortly after his arrest in Hungary, Mr. Chychasov agreed to cooperate with the Government. He also consented to his expedited extradition to the United States. During his cooperation, Mr. Chychasov provided the Government with comprehensive information regarding this matter. He also is open to further cooperation regarding said cases and to providing information regarding new matters.

There is no dispute that Mr. Chychasov 's substantial assistance was significant and useful as Defendant, from the very beginning, has been actively assisting law enforcement agencies in identifying historical and ongoing cybercrime intrusions and providing relevant and critical information. This active cooperation with the Government shows that he realized that his actions were wrong, and his cooperation is a first step to redress his wrongdoings. The extent of his cooperation is fully reflected in a 5K1.1 letter, which the Government expects to file.

It is well-settled that in determining the appropriate sentence within the Guidelines, or in varying from the guidelines, a sentencing court has the discretion to consider the Defendant's cooperation with the Government as an 18 U.S.C. § 3553(a) factor or through a downward departure. A substantial assistance departure can be granted only if the Government moves for one. See Wade v. United States, 504 U.S. 181, 184 (1992) (discussing USSG §5K1.1); United States v. Sandoval, 204 F.3d 283, 285 (1st Cir. 2000)(same).

In evaluating a defendant's assistance in the context of a U.S.S.G. § 5K1.1 motion, relevant factors include: (1) the court's evaluation of the significance and usefulness of the Defendant's assistance, taking into consideration the government's evaluation of the assistance rendered; (2) the truthfulness, completeness, and reliability of any information or testimony provided by the Defendant; (3) the nature and extent of the Defendant's assistance; (4)

any injury suffered, or any danger or risk of injury to the Defendant or his family resulting from his assistance; and (5) the timeliness of the Defendant's assistance. U.S.S.G. § 5K1.1(a).

Moreover, it should be noted that in determining the appropriate sentence within the Guidelines, or in varying from the Guidelines, a sentencing court has the discretion to consider the Defendant's cooperation with the Government as an 18 U.S.C. § 3553(a) factor. See, e.g., United States v. Terry, 771 F. App'x 277, 279 (4th Cir 2019)("the court was free to consider Terry's cooperation in the course of applying the § 3553(a) factors even in the absence of a substantial assistance motion."). See also United States v. Robinson, 741 F.3d 588, 599 (5th Cir. 2014) (collecting cases "holding that a sentencing court has the power to consider a defendant's cooperation under § 3553(a), irrespective of whether the Government files a [substantial assistance] motion"); United States v. Fernandez, 443 F.3d 19, 33 (2d Cir. 2006)("in formulating a reasonable sentence a sentencing judge must consider the contention that a defendant made efforts to cooperate, even if those efforts did not yield a Government motion for a downward departure pursuant to U.S.S.G. § 5K1.1 ("non-5K cooperation") as Section 3553(a)(1), in particular, is worded broadly, and it contains no express limitations as to what "history and characteristics of the defendant" are relevant. This sweeping provision presumably includes the history of a defendant's cooperation and characteristics evidenced by cooperation, such as remorse or rehabilitation.")

Regardless, since the Government intends to file a 5K1.1 substantial assistance motion, the Court should credit Mr. Chychasov's substantial assistance, sentencing him to time served as the extent of his cooperation warrants at least a 70-85% reduction. See, e.g., United States v. Ring, 811 F. Supp. 2d 359, 366 (D.D.C. 2011)(noting that "the leniency that results from such cooperation can be dramatic," reducing the guideline sentence by 85%); United States v. Burns, 438 F.3d 826 (8th Cir. 2005)(finding that a 60 percent reduction comported with § 3553(a) sentencing objectives and considerations); United States v. Christenson, 403 F.3d 1006,

1009 (8th Cir.), <u>affirmed en banc by an equally divided court</u>, 424 F.3d 852 (8th Cir. 2006) (finding that a 75 percent reduction comported with § 3553(a) sentencing objectives and considerations); <u>United States v. Pizano</u>, 403 F.3d 991, 996 (8th Cir. 2005) (finding that a 75 percent reduction comported with § 3553(a) sentencing objectives and considerations); <u>see also</u> the United States Sentencing Commission 2022 Report EXTENT OF §5K1.1 SUBSTANTIAL ASSISTANCE DEPARTURES BY TYPE OF CRIME (finding that data shows that the median percent decrease from guideline minimum for substantial assistance cases in fraud offense categories is **61 percent**). <u>See</u> Exhibit 3.

Last but not least, Mr. Chychasov's cooperation could be also considered as relevant to the "characteristics of the defendant" under 18 U.S.C. §3553(a)(1), and the "need to protect the public from further crimes of the defendant" under 18 U.S.C. §3553(a)(2)(C), because by cooperating he has severed his ties with criminal associates. <u>See</u> <u>United States v. Morgan</u>, 255 F.Supp.3d 869, at *873 (E.D. Wis. 2017)("Willingness to provide information also suggested that the defendant was willing to sever ties with criminal associates, which in turn suggested better behavior in the future.")

Therefore, this proactive cooperation should be considered by the Court as a substantial mitigating factor that warrants at least a 70-85% reduction of his Guideline range.

#### b. Need for Deterrence.

The need for deterrence and the need to protect the public from future crimes, 18 U.S.C. § 3553(a)(2)(B)(c), applies strongly in this particular case.

General or indirect deterrence focuses on the general prevention of crime by making examples of specific deviants. The individual actor is not the focus of the attempt at behavioral change, but rather receives punishment in public view in order to deter other individuals from deviance in the future. As one court explained, "when discussing general deterrence, the Sentencing Guidelines expressly refer to the need for 'a clear message [to] be sent

to society.' U.S.S.G. ch. 4, pt. A, introductory cmt. <u>United States v. Crespo-Ríos</u>, No. 13-2216, 2015 U.S. App. LEXIS 8555, *14 (1st Cir. 2015). While incarceration increases the deterrent effect of a sentence on others, "interest in general deterrence could [not] only be served by incarceration." <u>United States v. Prosperi</u>, 686 F.3d 32, 48 (1st Cir. 2012).   Specifically, the Sentencing Commission noted that the Sentencing Guidelines were written, in part, to "ensure <u>a short but definite period of confinement</u> for a larger proportion of these '<u>white collar</u>' cases, both to ensure proportionate punishment and to achieve deterrence." <u>See</u> United States Sentencing Commission, Fifteen Years of Guidelines Sentencing, 56 (November 2004).

Specific deterrence focuses on the individual in question. The aim of these punishments is to discourage the criminal from future criminal acts by instilling an understanding of the consequences.

First, Mr. Chychasov has already been detained for almost **19 months** since his arrest and detention in Hungary. This prolonged detention already serves as a powerful deterrence for the Defendant and sends a clear message to society that such behavior will not be tolerated by law enforcement and courts. He demonstrates substantial progress in his rehabilitation process.

Second, Mr. Chychasov is a first-time offender, and it is extremely unlikely that he will ever commit any crime. As a first-time nonviolent offender, with a significant role in his family, a long history of education and employability, no criminal history, and full acceptance of responsibility, there is nothing to suggest that Mr. Chychasov poses any threat or risk of committing another criminal offense. <u>See, e.g.</u>,  <u>United States v. Roth</u>, No. 05 CR 792-5, 2008 U.S. Dist. LEXIS 19603, at *7 (N.D. Ill. Mar. 11, 2008 (departing downward to sentence of probation where defendant posed no risk of recidivism based on lack of criminal history); <u>United States v. Paul</u>, 239 Fed. App' x. 353, 354 (9th Cir. 2007) (vacating defendant's 16 months' imprisonment for theft from a local government receiving federal funds, in part

because the defendant was a first-time offender with absolutely no criminal record whatsoever.); United States v. Ressam, 679 F.2d 1069, 1098 (9th Cir. 2012) (Reinhardt, J., concurring) ("Similarly, a significant factor in determining the appropriate length of a sentence for those committing criminal offenses is ordinarily their past criminal history. What is a reasonable sentence for a first-time offender will often be unreasonable for a defendant with a lengthy criminal record, and vise-versa); United States v. Baker, 445 F.3d 987, 990-92 (7th Cir. 2006) (upholding downward variance based on the fact that "a prison term would mean more to [a defendant who has never been incarcerated before] than to a defendant who previously has been imprisoned.") The character letters submitted on behalf of Mr. Chychasov conclusively demonstrate the aberrant nature of his conduct that landed him before this Court; they discuss not only his genuine remorse but also the unlikelihood to commit future crimes.

Overall, given the circumstances of this matter, the goals of general and specific deterrence have already been accomplished in this matter without unnecessary significant additional incarceration.

### c. Personal Characteristics of Defendant and Family Circumstances as Mitigating Factors

Mr. Chychasov has very strong family ties. His family, relatives, and friends have been fully supporting him immediately after his arrest. He is a proud father of a five-year-old daughter who desperately needs his financial and emotional support and guidance. See, e.g., United States v. Chambers, 885 F. Supp 12, 15 (D.D.C 1995)("family circumstances do not decrease the Defendant's culpability for her crime, they nevertheless play a role in the Court's consideration on sentencing. Causing the needless suffering of young, innocent children does not promote the ends of justice.").

The attached letters from Mr. Chychasov's family members and friends indicate their unconditional support during this ordeal. In those letters, Mr. Chychasov is characterized as "a wonderful father who has always coped well with his duties as the head of the family,"

"always took the lead and protected [his family] from unnecessary stress," "a sincere and kind person," "obedient, hardworking, kind, tender-hearted," "protected and cared for his weak and fragile wife, who has a disability," "a mentor and a friend to his employees," "hardworking, sociable and polite," "a reliable friend, ready to help and support in any situation," Exhibit 6.

 Moreover, as stated above, Mr. Chychasov's disabled wife Diana is extremely vulnerable. Diana is not permitted to lift anything heavier than approximately 6.6 pounds, and she experiences weakness in both of her arms and short-term memory loss. She is officially a disabled person who is not able to adequately take care of her daughter without Mr. Chychasov's help and support. As such, Mr. Chychasov's return to his wife is crucial for Diana's mental, emotional, and financial well-being, especially in light of the ongoing war in Ukraine. This is the extraordinary and compelling mitigating factor in light of Defendant's unique family circumstances pertaining to caregiving of his minor child and disabled spouse.

 Tatiana, Chychasov's mother-in-law describes how critical his support to Diana and his daughter is: "During the difficult period of my daughter Diana's illness, he supported her, and in my opinion, with his love, attention, and care, he helped her get back on her feet. Especially now in this difficult wartime, my daughter misses him. The war in Ukraine and stress have adversely affected her health; she often lies dizzy and cannot get out of bed. Her little daughter needs a lot of attention, and it's hard to do it by herself; a child needs both parents." Exhibit 6 at 1.

 In the same vein, given his parents age and serious health conditions, the fact that they are in the middle of the prolonged war that lasted for almost two years, without adequate medical treatment and special nutrition they require, Mr. Chychasov's presence is critical to their survival. Moreover, it should be noted that the parents and his family live close to the war zone, and they cannot leave Ukraine without Mr. Chychasov assistance. This factor alone warrants the requested grant of non-Guideline sentence of time served.

Mr. Chychasov is a caring and generous person who cares deeply not only for his close friends and family. Throughout his life, he was never motivated by evil or by malice. He is a man who has tried to do the right things but was caught up in a lifestyle that did not reflect his fundamental morals and characteristics.

You Honor, please take into account that you are sentencing a proud and caring husband and father, reliable son, and hard-working individual, whose criminal activities were just an unfortunate aberration from his otherwise law-abiding life. Moreover, please take into account the atrocities of war his family has been exposed to for almost two years without his support and love.

Finally, the following mitigating sentencing factors are relevant to the Court's consideration.

### Deportable Alien

Specifically, it is well-settled that foreign defendants like Mr. Chychasov, who are subject to deportation, suffer harsher terms of confinement because they are not eligible for home detention, community confinement, work release, intermittent incarceration, or minimum-security designation. Federal Courts have held that the court can consider a defendant's status, and that a downward variance for the severe or exceptional hardship in conditions of confinement for deportable aliens is authorized. See, e.g., United States v. Smith, 27 F.3d 649, 655 (D.C. Cir. 1994)(where deportable alien's sentence is more severe solely because of his alien status, a downward departure is proper); United States v. Charry Cubillos, 91 F.3d 1342, 1344 (9th Cir. 1996); United States v. Arowasaye, 112 Fed. App'x. 528, 532 (7th Cir. 2004)("the district court possessed the authority to depart downward based on [defendant's] status as an alien deportable to Nigeria who faces an additional term of incarceration there that is not accounted for[.]");  United States v. Ngatia, 477 F.3d 496, 502 (7th Cir. 2007)(recognizing  a reduced need to incapacitate a deportable alien in affirming a below-guideline sentence).

As such, purely based on his immigration status, Mr. Chychasov will not be eligible for many programs. He will be ineligible for any early release programs, commonly afforded to inmates who are United States citizens. To that same end, while many individuals sentenced post-First Step Act will receive additional days of time credit (10-15 days for every 30 days served for eligible prisoners who successfully participate in recidivism reduction programs or productive activities), Mr. Chychasov would not be able to benefit from this change in the law because of his immigration status. See FIRST STEP ACT, S. 756, Sec. 3632(d)(4)(E) ("Deportable Prisoners Ineligible to Apply Time Credits"). He cannot move into a halfway house to serve the final six months of his sentence. Therefore, he will serve more time in a Federal prison than most citizens. Therefore, the Court should consider this disparity as a relevant sentencing factor. It should be noted that Mr. Chychasov consents to his expedited removal/deportation from the United States if the Court sentences him to time served.

## Adjustment for Certain Zero-Point Offenders

New Amendment 821 relating to criminal history in Part B of the proposed amendment sets forth a new Chapter Four guideline at §4C1.1 (Adjustment for Certain Zero-Point Offenders).  The proposed U.S.S.G. §4C1.1 would provide a decrease of 2 levels from the offense level determined under Chapters Two and Three if the defendant meets all of the following criteria: (1) the defendant did not receive any criminal history points from Chapter Four, Part A; (2) the defendant did not receive an adjustment under §3A1.4 (Terrorism); (3) the defendant did not use violence or credible threats of violence in connection with the offense; (4) the offense did not result in death or serious bodily injury; (5) the instant offense of conviction is not a sex offense; (6) the defendant did not personally cause substantial financial hardship; (7) the defendant did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense; (8) the instant offense of conviction is not covered by §2H1.1 (Offenses Involving

Individual Rights); (9) the defendant did not receive an adjustment under §3A1.1 (Hate Crime

Motivation or Vulnerable Victim) or §3A1.5 (Serious Human Rights Offense); and (10) the

defendant did not receive an adjustment under §3B1.1 (Aggravating Role) and was not engaged

in a continuing criminal enterprise, as defined in 21 U.S.C. § 848) See

https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-

amendments/20230405_prelim-RF.pdf

       Moreover, on August 24, 2023, the Sentencing Commission issued a news release

in which it "allowed for delayed **retroactive application** of Amendment 821 relating to criminal

history—meaning that certain currently incarcerated individuals could be eligible for reduced

sentences made effective beginning on February 1, 2024." See

https://www.ussc.gov/about/news/press-releases/august-24-2023. U.S. District Judge Carlton W.

Reeves, Chair of the Commission, said "[t]hese prospective changes to the criminal history rules

made by the Commission in April reflect evidence-based policy determinations that apply with

equal force to previously sentenced individuals. Applying these changes retroactively will

increase fairness in sentencing." Id.

       Mr. Chychasov is a first-time offense and meets all the applicable criteria under

the Amendment. Moreover, since Mr. Chychasov's sentencing is just a few months before the

effective date of the Amendment, which would apply retroactivity to him, the Court to "increase

fairness in sentencing" should consider applying this two-point reduction to his sentence.

       As the Supreme Court reiterated, "[i]t has been uniform and constant in the

federal judicial tradition for the sentencing judge to consider every convicted person as an

individual and every case as a unique study in the human failings that sometimes mitigate,

sometimes magnify, the crime and the punishment to ensue." Pepper v. United States, 131 S. Ct.

1229, 1239-40 (2011)(quoting Koon v. United States, 518 U.S. 81, 113, 116 S. Ct. 2035, 135 L.

Ed. 2d 392 (1996).

Overall, the nature of the offense, Mr. Chychasov's personal characteristics, super productive substantial assistance, and family circumstances strongly favor the imposition of a non-guidelines sentence. Please keep in mind that Mr. Chychasov's sentence would affect not only his life but also the lives of his young child, disabled wife, and elder parents, who desperately need his assistance, guidance, and love while suffering the consequences of being in a country being destroyed by Russian army's daily bombing and the scarcity of food, shelter, and adequate health care.

Mr. Chychasov admitted his mistakes and learned his lessons, and the sentence of time served would help him to rebuild his life and reunite him with his wife, his daughter, and his parents.

## **CONCLUSION**

For all these reasons, Mr. Chychasov respectfully requests that the Court impose a non-guideline sentence of time served. This sentence would be sufficient but not greater than necessary to achieve the goals and dictates of 18 U.S.C. § 3553.

Dated: November 20, 2023

/s/ Arkady Bukh
_____

Bukh Law Firm, PLLC
1123 Avenue Z
Brooklyn, NY 11235
(718) 376-4766
honorable@usa.com

Attorneys for Defendant Chychasov

cc:

Clerk of the Court  (by ECF)
All counsel of record (by ECF)